IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOEY TORRES,

        Plaintiff,

v.                                                                    No. CIV 04-248 LFG/RHS

JACK BORREGO,
REGIS CORPORATION,
PAT MUELLER, and
RAMONA AGUILAR,

        Defendants.

## MEMORANDUM OPINION AND ORDER

### Introduction

THIS MATTER is before the Court on Defendants' motion to strike [Doc. No. 97] the

second affidavit of Joey Torres (submitted as Ex. S-1 to Doc. No. 77) and two defense motions[1] for

summary judgment: (1) Defendants' Regis Corporation ("Regis"), Pat Moeller[2] ("Moeller") and

Ramona Aguilar ("Aguilar") (or "Defendants") Motion for Partial Summary Judgment on Plaintiff's

Claims of Defamation, Breach of Contract, and Intentional Infliction of Emotional Distress, filed

February 15, 2005 [Doc. No. 65]; and Defendant Jack Borrego's ("Borrego's) Motion for Summary

---

[1]In order to clear up all pending motions, the Court also denies as moot both Regis's and Moeller's
Motion for Protective Order [Doc. No. 60] regarding February 11, 2005 depositions and Plaintiff's unopposed
motion for an order to file documents under seal [Doc. No. 82].  The Court assumes that the parties have resolved
both of these motions, one of which was unopposed.  Defendants' (Regis, Moeller and Aguilar) partial motion for
summary judgment on the Title VII claims [Doc. No. 67] is decided in a separate Memorandum Opinion and
Order.

[2]Based on Defendants' spelling of Moeller's name, the Court assumes the correct spelling is Moeller and
not Mueller as set forth in the caption.

Judgment, filed February 15, 2005 [Doc. No. 62.]  The motion to strike affidavit may be resolved without a response or further briefing.  Both motions for summary judgment are fully briefed and ready for resolution.  Oral argument is not necessary, and these motions may be resolved on the parties' written submissions.

In the motion to strike, all Defendants (Regis, Aguilar, Moeller and Borrego) argue that Torres' second affidavit is an improper attempt to create a sham issue of fact and therefore, should be stricken or disregarded in its entirety.  While arguing that Torres has changed his testimony as to "key events,"  Defendants acknowledge that even assuming all of Torres' allegations in the second affidavit are true, the second affidavit does not raise genuine issues of material fact for a jury to decide.

The Court concludes that Torres' second affidavit does not create sham issues with respect to the material facts at issue.  It is true that portions of Torres' testimony in the second affidavit are at times inconsistent with some of his previous sworn testimony.  Yet, those portions of testimony also are consistent with <u>other</u> prior sworn testimony by Torres.  For example, Defendants state that Torres' second affidavit contradicts his original affidavit regarding whether Torres placed a bank deposit bag in his house for safety versus whether he placed it in the trunk of his car and left it there.  However, the testimony in Torres' second affidavit about this issue is consistent with his testimony two of his three depositions (May 10, 2004 and Oct. 18, 2004) and also consistent with Aguilar's May 11, 2004 deposition testimony.  Most, if not all of the inconsistencies raised in the motion to strike are more properly the subject of witness cross-examination.  For these reasons, the Court denies the motion to strike.

2

With respect to the two motions for summary judgment, the Court has carefully considered the pertinent law, pleadings, attachments, supplemental exhibits, and sealed exhibits. The Court concludes, for the reasons set out below, that Defendants' partial motion for summary judgment on the state law claims will be granted in part and denied in part, and that Defendant Borrego's motion for summary judgment will be granted in part and denied in part.[3]

### Background

This is an employment discrimination action brought against Defendants by Plaintiff Joey Torres ("Torres" or "Plaintiff"). Torres, who was a hair stylist for Regis, asserts, *inter alia*, that he was subjected to *quid pro quo* sexual discrimination and a hostile work environment based on his gender and was unlawfully discharged for refusing to have sexual relations with Regis' area manager, Jack Borrego. Moeller was Borrego's regional manager, and Aguilar was Torres' direct supervisor at the time of Torres' termination.

Torres also brings state law claims of defamation, breach of contract and intentional infliction of emotional distress against Defendants. [Doc. Nos. 1, 9.] Torres seeks injunctive relief in the form of an Order from the Court directing that he be rehired by Regis. He also requests punitive damages and monetary awards for back pay and emotional distress. [Doc. No. 1.]

---

[3]The Court advises the parties that the Opinions and Orders it is entering on Defendants' motions for summary judgment do not address any claims state law claims brought under the New Mexico Human Rights Act ("HRA"). According to the pleadings, Torres was successful on certain claims he raised before the New Mexico Human Rights Commission. Regis appealed that decision to the New Mexico Second Judicial District Court. The claims before the State court apparently are similar to those raised here, but include claims brought under the HRA. Torres did not assert claims under the HRA in this federal proceeding. However, he did file a motion in this proceeding to add state court causes of action to his federal lawsuit. [Doc. No. 40.] Defendants opposed the motion. [Doc. No. 50.] The Court entered an Order denying Torres' request to add the state court action (because of the related request to modify scheduling deadlines) but allowing joinder under certain conditions. Torres did not proceed in accordance with the Court's order to consolidate the two actions, and therefore, it is assumed that he elected not to proceed with consolidation. Based on the pleadings, it appears that the State court proceeding is stayed pending resolution of the federal lawsuit.

Defendants request partial summary judgment on Torres' state law claims of defamation, breach of contract and intentional infliction of emotional distress. Borrego seeks summary judgment on all claims asserted against him, including the Title VII claims.

## Summary Judgment Standard

Summary judgment is not a "disfavored procedural shortcut." Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment. Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied,* 537 U.S. 816 (2002). Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion

4

may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P. 56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  Mitchell v. City of Moore, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

## Material Facts

The Court summarizes the following material facts based on the pleadings and supporting exhibits.  The Court views all reasonable inferences drawn from the record evidence in the light most favorable to Plaintiff.

Torres was employed by Regis and worked at the Sensations Salon in the Cottonwood Mall in Albuquerque, New Mexico.  It is not clear how long Torres worked for Regis as a stylist, but he was employed by Regis as early as 1999.[4]  This lawsuit concerns Torres' termination on January 21, 2003.  It is uncontested[5] that between 1999 and the January 2003 termination date,  Regis had taken some disciplinary actions towards Torres for various work-related issues.  Defendants contend that Torres' termination in January 2003 was supported by some of these earlier disciplinary issues with Torres.  However, Torres asserts that the earlier disciplinary actions (occurring in 2002) amounted to nothing more than "picking on him" after he refused to submit to Borrego's sexual advances in late 2001.

---

[4]In late 1999, Torres was terminated by Regis but then re-hired on May 22, 2000 by Regis.  It appears that Torres may have worked for Regis salons some years prior to 1999 as well.

[5]The specifics of some of these work-related issues and/or related disciplinary actions are disputed.  For example, Torres does not remember an alleged verbal warning he was given, and disagrees with some of Defendants' stated reasons for the disciplinary actions.

Defendants contend that Torres was terminated on January 21, 2003 because they learned on that same date through Regis' cash department that a bank deposit was missing from the Sensations Salon.  It is uncontested that Torres was supposed to have made a bank deposit on the night of January 14, 2003 and that the deposit was not made.  Torres does not dispute that he had the bank deposit, neglected to make the deposit for a week and failed to inform Defendants during that time that he had not made the deposit.  It also is uncontested that Torres exchanged the original deposit bag for a replacement bag during that week because his puppies chewed up the original bag.[6]

Torres alleges, however, that he obtained a new bag and intended to make the deposit the next time he was responsible for a deposit drop.  Torres also asserts that when asked about the deposit by supervisor Aguilar, he took Aguilar to his car trunk where he had the new bank deposit bag containing the original currency, coin and checks for the January 14 deposit (which amounted to about $60.00 according to Torres).  Torres states that he told Aguilar about the new bag and that he doubted she would have discovered that he had replaced the original bag with a new one.  Aguilar, in her deposition testimony, stated that Torres had told her that his dogs had torn up the original bank deposit bag.

Torres does not challenge Defendants' assertion that upon learning about Torres' failure to make the deposit, Borrego spoke to Moeller and a decision to terminate Torres was made.  Defendants assert that Borrego and Moeller jointly made the termination decision.  Aguilar also may have had input regarding the termination decision.  Torres contends that Borrego made the

---

[6]Defendants assert through deposition questions and in their Motion to Strike [Doc. Nos. 97, 98] that the details about the replacement of the original deposit bag with another are important because Torres' explanations as to what happened to the bag are "all too consistent with the possibility" that Torres opened the deposit bag, and supplied himself with a "self-granted 'loan'" while giving himself a little time before re-paying the "loan." Defendants' position is speculative and more properly raised in their examination of the witnesses.

termination decision on his own authority alone and that according to Aguilar,  Borrego had been looking for a way to terminate Torres.

In support of his position, Torres argues that the real reason for his termination was that Torres refused the sexual advances of Borrego in late 2001, over a year before Torres was terminated.  Torres asserts that in late 2001, his manager Dee Tsosie asked Torres to come to dinner with her and Borrego who was Regis' area manager.  The three were to meet at a restaurant. Sometime before the appointed time, Torres called Tsosie who told him she would not be attending the dinner which left Torres alone to have dinner with Borrego.  When Borrego met Torres outside the Lone Star restaurant, Borrego stated that he wished to eat elsewhere and that Torres should come with him in the company car.  Torres drove with Borrego to the Olive Garden.  (*See* Court's Memorandum Opinion and Order addressing Defendants' Motion for Summary Judgment on the Title VII claims for a more detailed version of the facts.)

After dinner, Borrego invited Torres to have a drink at his hotel, but the hotel bar was closed and Borrego asked Torres to his hotel room where Borrego could fix the two drinks.  Torres sat down in a chair so that Borrego could not sit near him, and Borrego fixed them cocktails.  Borrego then turned on the television and played a pornographic movie.  He then sought to perform oral sex acts with Torres.  Torres refused the advance telling Borrego, "Jack, you know I don't swing that way." Borrego allegedly told Torres that he (Borrego) gave the "best head."  Torres continued to refuse Borrego's requests for sex. Torres alleges that Borrego then laid down on the bed and touched his genitals through his pants in front of Torres.  Torres contends that he asked for a ride home and that Borrego suggested he take a cab.  Torres called a cab and left Borrego's hotel.

7

Torres also asserts that Borrego continued to call Torres after this incident on a regular basis, inviting him to have sex with him and that the last of these calls occurred about a month before Torres was terminated.  Torres claims that he declined all of Borrego's invitations or ignored the invitations.

Borrego denies that this entire incident occurred, including dinner with Torres.  He also denies having made telephone calls to Torres, although Torres supplied evidence that Borrego made at least one telephone call to Torres' cell phone from Borrego's hotel room telephone.  Defendants further deny that Torres was terminated for any reason other than Torres' failure to make the bank deposit along with previous disciplinary issues.

Torres submits evidence that Regis did not have a uniform policy as applied to other employees regarding making bank deposits and that other employees had failed to make deposits without being disciplined or terminated.  Torres admits that Regis had written security regulations in place regarding procedures for bank deposits and that he violated those regulations.  However, he contends that the regulations were subject to inconsistent application by Defendants, and that, in this case, his termination for violating these regulations was a pretext for the real reason he was terminated, i.e., Torres' rebuff of Borrego's sexual advances.

Within one to two weeks after his termination, Torres obtained new employment as a stylist at J.C. Penny's hair salon and at Hair Brain.  Two other salons would have hired him as well.  Torres worked at J.C. Penny's for about five to six months before having to leave that salon due to Penny's policy prohibiting work at two salons.  Torres continued to work at Hair Brain, but now works in a different salon.  According to Plaintiff's Complaint, Regis classified him as not "rehireable" when it terminated him in January 2003.  For some reason, Defendants' response to this allegation in the complaint was that they did not have sufficient information to provide an answer.  It is unclear

8

whether the allegation is contested or not, but for purposes of Defendants' partial motion for summary judgment, it makes little difference.[7]

## I.    DEFENDANTS' (REGIS, MOELLER, AGUILAR) MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS OF DEFAMATION, BREACH OF EMPLOYMENT CONTRACT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### A.    Defamation

Under New Mexico law, defamation is defined as "a wrongful [and unprivileged] injury to a person's reputation. UJI 13-1001.  To establish a claim of defamation, plaintiff bears the burden of proving nine contentions: publication of the communication at issue; that the communication contained a statement of fact; that it concerned the plaintiff; that the statement of fact was false; that the communication was defamatory; that the person(s) receiving the communication understood it to be defamatory; that the defendant knew the communication was false or negligently failed to recognize that it was false or acted with malice; that the communication proximately caused actual injury to plaintiff's reputation; and that the defendant abused its or their privilege to publish the communication.  UJI 13-1002.

Torres alleged in his complaint that when Regis terminated him, he was classified as not being "rehireable" and that as a result of this termination, Torres was unable to provide positive employment references "to which he would otherwise be entitled."  This inability to procure positive references from Regis, according to Torres, was "tantamount to employment defamation." [Doc. No. 1, ¶¶ 70-72.]

---

[7]Borrego's deposition testimony indicates that he believed Torres was not rehireable after the 2003 termination but that he never communicated to anyone that Torres was not rehireable.

Defendants assert that Torres not only is unable to establish the required nine elements, he also failed to even allege the requisite elements.  The Court agrees.  In Torres' three-sentence response to Defendants' summary judgment position on this claim, Torres stated that he was unable to seek the work of his choice at premium salons because of lack of employment references.  Moreover, he argued that the negative reference he could anticipate from Regis, i.e., that he was not "rehireable," unfairly affected his ability to pursue the job of his choice.  [Doc. No. 76, pp. 12-13.]

There is no genuine issue of material fact for a jury to decide with respect to the defamation claim.  Torres fails to allege or provide evidence to support a contention that Defendants "published" any defamatory communication.  Even if Defendants classified Torres as not being someone they would rehire and even if this classification could be considered defamatory, there is no evidence that Defendants communicated the classification to anyone.  Moreover, there is no evidence or allegation that this "statement of fact" was false or defamatory as New Mexico law defines this tort.  In addition, it is uncontested that Torres applied to four salons after his termination and that all four wished to hire him.  Two salons did hire him.  Thus, Torres fails to allege or provide evidence that he was harmed by any alleged defamatory statement that might have been made.

There are a number of other deficiencies with respect to Torres' attempted claim of defamation.  However, the Court need not address each and every required element of the claim other than to observe that Torres failed to allege or provide evidence of virtually all of the elements of a defamation claim.

The Court grants summary judgment in favor of all Defendants as to the defamation claim, and it is dismissed, with prejudice.

10

### B.     **Breach of Employment Contract**

#### 1.     *Asserted Against the Individual Defendants*

The Court interprets Torres' complaint as an attempt to state a claim of breach of contract against Defendant Regis only.  [Doc. No. 1, ¶ 77.]  Moreover in Torres' response to the motion for summary judgment, he discusses the claim only in terms of his employer Regis, rather than the individual Defendants.  To the extent that Torres intended to assert a breach of contract claim against the individual Defendants, such a claim would fail as a matter of law.  Even if it is established that an employment contract existed between Torres and Regis that was breached, the individual Defendants were not parties to that contract and therefore, could not be held liable for alleged breaches.  *See* Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518-19 (3d Cir.) (holding that individual members of a college tenure committee could not be sued for breach of contract because they were not parties to any employment contract between the plaintiff and college), *cert. denied in part,* 479 U.S. 812 (1986), *aff'd by*, 481 U.S. 604 (1987);  Gonzalez v. Comcast Corp., 2004 WL 1737693 at *2 (D. Del., July 30, 2004) (individual defendants were not parties to the employment contracts with the plaintiffs, and therefore, the parties agreed the individual defendants were not subject to alleged breach of those contracts).  *See also* Romero v. Mervyn's, 109 N.M. 249, 254 (1989) (agent of employer not personally liable on contract unless the agent is expressly made a party to the contract).

Therefore, to the extent that Torres sued Aguilar and Moeller for breach of employment contract, that claim is dismissed, with prejudice as to the individual Defendants.

#### 2.     *Asserted Against Regis*

Torres' breach of contract claim alleges that he "enjoyed an at will contract with Regis" and that "[a] term of the at will contract was that Joey Torres would work in a work environment free

from sexual harassment and free from sexually charged work environment." [Doc. No. 1, at ¶¶ 75, 76.] Torres asserts that Regis breached "these conditions as well as the implied covenant of fair dealing." [Id., at ¶ 77.]

In his response to Defendants' motion for summary judgment as to this claim, Torres argues that "Regis failed in its contractual obligation to keep the work environment free of *quid pro quo* discrimination and retaliatory actions based on the refusal to participate in *quid pro quo* requests for sex and sexual favors." [Doc. No. 76, p. 13.] "This is a reasonably implied term of the work contract at Regis and the materials Regis claims to present to employees." [Id.]

In attempting to state a breach of contract claim against Regis, Torres appears to rely on Regis' "Non-Discrimination and Workplace Harassment Policy" set forth in Regis' New Employee Orientation Packet ("anti-discrimination/harassment policy"). However, Torres does not explicitly reference the policy, and indeed, states in his response brief that he "has no memory of ever receiving a copy of the Regis New Employee Orientation Manual" (which contains the anti-discrimination/ harassment policy). In his supporting second affidavit, Torres clarifies that he can say "certainly" that he has no memory of ever receiving this document. When he was first employed by Regis, Torres notes that there were no orientation and materials "ever provided." [Plaintiff's Ex. S-1, at ¶ 30.]

It is true that a company's policy, handbook or manual may result in contractually binding an employer to comply with certain procedures if the employee relies on those procedures. *See* Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1515 (10th Cir. 1995) (internal citation omitted) (discussing contract claim in terms of Colorado state law). However, if an employer never receives a copy of the policy/procedure at issue, he or she generally cannot be said to have relied on it. "In general, handbooks should not be given contractual effect unless the employee can establish that she knew of

the provisions in question, that her employer induced her to rely on the provisions and that she did in fact rely on them." <u>Bayliss v. Contel Federal Systems, Inc.</u>, 930 F.2d 32 (Table, Text in Westlaw), 1991 WL 47111 (10th Cir. 1991) (applying New Mexico law). In <u>Bayliss</u>, the Tenth Circuit observed that while New Mexico law is a bit unclear regarding what a plaintiff must demonstrate to show reliance, New Mexico courts have treated reliance as an important factor in determining the existence of an implied contract. <u>Id.</u> at *5. *See also* <u>Paca v. K-Mart Corp.</u>, 108 N.M. 479, 480-81 (N.M. 1989) (because handbook applied to hourly employees and was not given to the plaintiff, the plaintiff had no reason to rely on its contents); <u>Hartbarger v. Frank Paxton Co.</u>, 115 N.M. 665, 673 (1993) (where employee received yellow handbook and not red handbook, only the yellow handbook was determined to have affected the employment relationship between the parties), *cert. denied,* 510 U.S. 572 (1995).

Here, Torres did not receive the anti-discrimination/sexual harassment policy upon which he attempts to rely.[8] He does not discuss any specific provision of that policy, nor how Regis allegedly breached any provisions of the policy. Indeed, to the extent the policy could constitute an employment contract between the parties, it appears that Torres himself may not have complied with the reporting provisions. [*See* Defendants' Ex. M, ¶ XII.] Moreover, the manual's introductory pages very specifically disclaim (in large print) the possibility that any type of contract be formed on the basis of the manual's contents. [Defendants' Ex. M, p. 2.]

---

[8]Based on the exhibits, is difficult to determine whether Torres alleges that he never saw the anti-discrimination/harassment policy or whether he did see it at some point <u>after</u> the hotel incident since he signed an acknowledgment form on March 3, 2002 that he had read and understood the Workplace Harassment Policy. The Court is unable to determine if that policy differs from the anti-discrimination/harassment policy that Torres alleges he never received. The only harassment policy provided to the Court was contained in defense exhibit M. Even if there was a harassment policy Torres relied on, he failed to identify any particular provisions of that harassment that were breached. Moreover, the claim is subject to failure for the additional reason that the Court concludes such policy statements do not create an enforceable contractual right to a harassment-free workplace.

While Torres does not demonstrate how he could have relied on a policy he did not know about and had never seen, the claim is also subject to dismissal because Torres fails to supply any support for the proposition that the sexual harassment policy creates enforceable contractual rights between the parties.  Contrary to Torres' assertions, the non-discrimination/harassment policy does not and could not promise an employee that he or she would work in a harassment-free or discrimination-free work place.  Such a scenario envisions a perfect world.  The reality is that the company's policy merely sets forth certain prohibitions in the work place and the type of action that should be taken in response should the prohibited conduct occur.  In other words, Regis' anti-discrimination/harassment policy is more akin to general policy statements that are insufficient to create an implied contract.  *See* Steiber v. Journal Publishing Co., 120 N.M. 270, 274 (Ct. App.), *cert. denied*, 120 N.M. 68 (1995).  *See also* Arnold v. Janssen Pharmaceutica, Inc., 215 F. Supp. 2d 951, 962-63 (N.D. Ill. 2002) (vague promises by an employer to treat its employees fairly is not sufficient under Illinois law to support reasonable reliance by an employee).

Finally, Torres' claim of breach of the anti-discrimination/harassment policy is directly linked to his Title VII harassment claims, and as such, is duplicative of those claims.  *See* Horizon Holdings, LLC v. Genmar Holdings, Inc., 241 F. Supp. 2d 1123, 1147 n. 13 (D. Kan. 2003) (contract theory that breach stemmed from the defendants' alleged termination of the plaintiff in retaliation for engaging in activity protected under Title VII was duplicative of Title VII retaliation claim).  For all of these reasons, the Court grants summary judgment in favor of Regis on the employment contract claim, and the claim is dismissed, with prejudice.[9]

---

[9]The Court notes that Torres did not attempt to state a claim for breach of express or implied contract with respect to disciplinary procedures Regis may or may not have included in an employee handbook.  While there are arguments (found in deposition testimony) relating to Regis' alleged failure to follow a "graduated discipline"

C.    **Intentional Infliction of Emotional Distress**

To establish a claim of intentional infliction of emotional distress ("IIED") under New Mexico law, Torres must prove:  "(1) the conduct in question was extreme and outrageous;  (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff;  (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress."  Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 616 (2001) (quotation omitted).

New Mexico courts have adopted the approach used in the Restatement (Second) of Torts § 46 (1965) with respect to addressing the claim of IIED.  Extreme and outrageous conduct is described as conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Restatement (Second) of Torts § 46 cmt. d.  The New Mexico Court of Appeals decided in Stock v. Grantham, 125 N.M. 564, 964 P.2d 125, 136 (Ct. App.), *cert. denied*, 125 N.M. 322 (1998), that only in extreme circumstances would the act of firing an employee support a claim of IIED.  This is true because the act of being fired is a common occurrence that rarely rises to the level of outrageous or extreme conduct that supports a claim of IIED.

In addition, for an IIED claim to survive, the plaintiff must present evidence to support the view that he suffered severe emotional distress.  "Severe emotional distress means that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered

---

policy, no claim to that effect was pled.  Torres did attach as an exhibit some conference or training materials that Regis employees may have reviewed or received, but he did not allege that those materials constituted Regis' policy or that those provisions were breached.  [*See* Plaintiff's Ex. 4.]

by the circumstances.'" Trujillo, 131 N.M. at 617 (internal citations omitted).  In other words, Torres

must show that no reasonable person could be expected to endure it.  Id.

As a threshold matter, the trial court determines as a matter of law whether the conduct at

issue "reasonably may be regarded as so extreme and outrageous that it will permit recovery under

the tort of IIED."  Padwa v. Hadley, 127 N.M. 416, 419, cert. denied, 127 N.M. 389 (1999).  If

reasonable people would differ on that question, the jury must be decide the matter.  Id.

### 1.     Asserted Against Individual Defendants Moeller and Aguilar

In his complaint, Torres alleges that all of Defendants' actions, but "particularly those of Jack

Borrego" were egregious, wanton and in utter disregard for Torres' well being and emotional safety.

[Doc. No. 1, ¶ 79.]  Torres then asserts that Borrego's actions were undertaken intentionally, were

beyond all common decency and civilized behavior, and were utterly outrageous.  [Id. at ¶¶ 79, 80.]

Torres further alleges that Borrego's intentional acts caused extreme emotional damages "in the

plaintiff" that continues and may continue indefinitely.  [Id. at ¶ 82]

In his response to Defendants' motion for summary judgment, Torres states that there is

"ample evidence" to support the claim of IIED against Regis, Aguilar and Moeller, based on evidence

that Aguilar knew of the "scheme to terminate Torres in retaliation and knew of Borrego "hitting on"

Torres.

Torres next concedes that the IIED claim against Moeller is "more tenuous."  Torres alleges

that Moeller "turned his back on the operation led by Jack Borrego," that Moeller ignored signs that

Borrego was protecting employees who were sexually harassing heterosexual individuals, took a very

cavalier attitude that Borrego could do no wrong and encouraged a company environment that did

16

not enforce mandatory adherence to policies in place. "Not as clearly as with Aguilar, Pat Moeller's behavior was nonetheless 'Outrageous.'"

With respect to the IIED claim asserted against Aguilar and Moeller, the Court concludes as a threshold matter that none of the allegations constitute conduct that would reasonably be regarded as so extreme and outrageous as to permit recovery, beyond the bounds of decency or utterly intolerable in a civilized society. Certainly, this is true with respect to Moeller against whom Torres essentially admits he has, at best, weak evidence to support the IIED claim. Most of the very few allegations made against Moeller are conclusory, speculative and unsupported by record evidence.

Regarding the allegations of IIED against Aguilar, again the Court does not find that even if considered true, Aguilar's knowledge that Borrego was looking for a way to terminate Torres, an at-will employee, is sufficient to permit the IIED claim against Aguilar to proceed to a jury. Even if Aguilar knew of Torres' allegations regarding Borrego's sexual advances to Torres in the hotel room, these allegations alone are not sufficient to demonstrate intentional or reckless disregard of Torres on the part of Aguilar or that Aguilar's conduct was causally connected to "severe emotional distress" purportedly suffered by Torres. In fact, there simply is no showing that Aguilar allegedly acted in such a way as to cause Torres the type of "severe emotional distress" contemplated by the tort of IIED. Discharge decisions alone do not provide the basis for claims of IIED. Ramirez v. IBP, Inc., 1994 WL 732612 at *2 (D. Kan. Nov. 18, 1994) ("Employment decisions, like terminations and demotions, are not extreme or outrageous in character simply because they affect the employee adversely.")

17

Therefore, the Court grants Defendants' motion for partial summary judgment as to the IIED claims asserted against Aguilar and Moeller and they are dismissed, with prejudice.

### 2. *Asserted Against Regis*

Generally, an employer is held liable under *respondeat superior* principles for only those torts committed within the scope of employment. Regis claims that it cannot be held liable under *respondeat superior* principles for Borrego's alleged intentional torts (e.g., IIED) because when an employee intentionally injures another, he acts outside the scope of his employment. Even if Regis could be held liable for alleged IIED by Borrego, Regis further asserts that Torres made no showing of how Regis aided Borrego in committing the tort of IIED. Lastly, Regis argues the merits of the IIED claim as asserted against Borrego.

The Court first examines whether Regis can be held liable for a supervisor's alleged IIED upon an employee, and next decides whether there are genuine issues of material fact for a jury to decide whether Borrego intentionally inflicted emotional distress upon Torres.

Defendant Regis is correct that under *respondeat superior* principles, an employer is generally liable for only those torts committed by an employee while acting within the scope of his employment. It is also true that intentional torts are typically considered to be outside the scope of one's employment.

> Under basic respondeat superior principles, an employer is liable for an employee's torts committed within the scope of his or her employment. Thus, under these principles, an employer is not generally liable for an employee's intentional torts because an employee who intentionally injures another is generally considered to be acting outside the scope of his or her employment. Intentional torts arising from sexual harassment are generally considered to be outside the scope of employment.

18

Ocana v. American Furniture Co., 135 N.M. 539, 551-52 (2004) (internal citations omitted).

In Ocana, the New Mexico Supreme Court also decided whether an employer might be held liable for the intentional torts of its employee acting outside the scope of his employment when the employee "was aided in accomplishing the tort by the existence of the agency relation." Id. at 552. While the New Mexico courts had not adopted the "aided-in-agency" theory of employer liability, the New Mexico Supreme Court did not believe it would be a radical departure to adopt the theory of vicarious liability.

The question then is whether Torres presented sufficient evidence showing Borrego was aided by his status as Torres' area supervisor in committing the alleged torts. Regis argues he has not. The Court concludes Torres provided sufficient evidence to raise a genuine issue of material fact for the jury to decide. For example, Torres provided evidence that he went out to dinner on the night in question with Borrego because of his manager's request that Torres meet with her and Borrego, the area manager. Also, Torres went to Borrego's hotel room because Borrego was his manager, and Borrego had asked him to come up for drinks in his room. This is enough to raise a genuine issue of material fact as to whether Borrego was aided in accomplishing the alleged tort by Borrego's agency relationship. In viewing all inferences in favor of Torres, it is unlikely that Torres would have accepted a dinner invitation, gone to another man's hotel room, and agreed to have a drink with him unless he felt compelled to do so because of the employment relationship. Therefore, the Court concludes that if the IIED claim is permitted to proceed against Borrego, Regis could be held liable under the "aided-in-agency" theory of employer liability. See Deflon v. Danka Corporation Inc., 1 Fed. Appx. 807, 822, 2001 WL 13260 at *13 (10th Cir. Jan. 5, 2001) (applying New Mexico law and holding that an employer may be held liable for the IIED inflicted by an employee).

19

Next, the Court must decide whether the allegations of IIED against Borrego are sufficient to raise genuine issues of material fact for a jury to trial. The Court recognizes that "mere insults, indignities, threats, annoyances, petty expressions, or other trivialities" do not rise to the level of outrageous conduct. Restatement (Second) of Torts § 46 comment. Moreover, a number of courts have been reluctant to extend the tort of outrage to discrimination and sexual harassment claims, arising in the employment setting. *See, e.g.,* Bolden v. PRC Inc., 43 F.3d 545, 554 (10th Cir. 1994) (applying Kansas state law), *cert. denied*, 516 U.S. 826 (1995); Haburjak v. Prudential Bache Securities, 759 F. Supp. 293, 302 (W.D.N.C. 1991) (applying North Carolina law); McCreary v. Libbey-Owens-Ford Co., 132 F.3d 1159, 1167 (7th Cir. 1998) (applying Indiana state law); Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1998) (applying Pennsylvania state law). These courts concluded that the requirements to prove IIED in the workplace are more rigorous, reasoning that it is difficult to demonstrate the high standard of "extreme and outrageous" conduct in the employment context.

Notwithstanding the rigorous standards required even by courts that are reluctant to extend the tort of IIED in the employment context, these same courts have permitted such claims to proceed where there are particularly strong allegations. *See, e.g.,* Laughinghouse v. Risser, 754 F. Supp. 836 (D. Kan. 1990) (IIED claim survived summary judgment in the context of alleged sexual harassment by a supervisor); Glover v. Heart of Am. Mgmt. Co., 38 F. Supp. 2d 881, 889 (D. Kan. 1999) (evidence of extreme sexual harassment sufficiently outrageous to survive summary judgment as to first prong of IIED claim). Moreover, New Mexico courts have not expressly stated that an IIED claim cannot survive in the employment context and indeed, have permitted such claims to proceed.

20

Ordinary business decisions and ordinary employment disputes are typically not fodder for IIED claims. Here, however, the allegations of sexual harassment do not merely arise out of ordinary business decisions. Torres supplies detailed allegations that he was propositioned by his supervisor Borrego in Borrego's hotel room, treated differently by Borrego and other supervisors after his refusal to submit to Borrego's sexual advances, called by Borrego on a number of occasions after the hotel incident and again invited to participate in sexual activities with Borrego (the most recent call allegedly occurring about a month before being terminated), and ultimately, terminated by Borrego and other supervisors for an incident that did not consistently warrant discipline and/or termination of other employees. These allegations are sufficient to raise a genuine issue of material fact as to whether the conduct was sufficiently outrageous to support a claim of IIED and as to whether Borrego's conduct was intentional or taken with reckless disregard of Torres.

The Court also determines, as discussed *infra,* that there are genuine issues of fact for a jury to decide regarding Torres' alleged severe emotional distress and the link between Borrego's conduct and that emotional distress. Therefore, the IIED claim as asserted against Regis will proceed to trial, and Defendants' motion for partial summary judgment on that claim is denied.

## II.   DEFENDANT JACK BORREGO'S MOTION FOR SUMMARY JUDGMENT

Borrego seeks dismissal of all claims asserted by Torres against him, including Title VII claims of hostile work environment, sexual harassment, sex discrimination and retaliation, along with the state law claims discussed above – defamation, breach of employment contract and intentional infliction of emotional distress.

For the same reasons stated above, the claims of defamation and breach of employment contract, to the extent that they were asserted against Borrego, will be dismissed, with prejudice.

21

A. **Intentional Infliction of Emotional Distress Claim Asserted Against Borrego**

The Court does not repeat the discussion of New Mexico law as to this claim. *See* discussion *supra.* As discussed *supra*, the Court concludes that there is a genuine issue of material fact as to whether the alleged conduct at issue, including the sexual advances, the offer to perform oral sex, and the subsequent attempts and/or invitations to get together with Borrego were "extreme and outrageous," and whether Borrego's alleged conduct was intentional or in reckless disregard of Torres.

It is a far closer question whether Torres presented evidence sufficient for a jury to decide that he suffered "severe emotional distress" caused by Borrego's conduct. In his first affidavit, signed April 30, 2003, Torres did not allege any severe emotional stress, nor did he discuss any injuries he suffered from the event(s) at issue. In his second affidavit, signed two years later, Torres alleged that he was "briefly hospitalized for emotional problems" he experienced. Torres did not provide any hospital records to support the assertion nor a date of the hospitalization and length of stay. He also alleged in the second affidavit that he felt suicidal and that his mother took him to the psychiatric ward at UNM where he was "held." Again, Torres supplies no evidence when this occurred or how long he was held in a psychiatric ward.

However, Torres attached a few pages of deposition testimony from his mother, D. D. Torres. She testified that Torres had been "troubled" and "closed off from pretty much everything" after the Regis incident. D. D. Torres described Torres as depressed, sad, and crying. Mrs. Torres testified that on one unspecified date, she had taken Torres to the university mental health center and that he had seen a doctor there who prescribed Zoloft and Benadryl for him. The last page of Mrs. Torres' attached deposition testimony states that Torres had a gun on one occasion and was really sad and

22

depressed and that she had taken him to the emergency room.  Again, no date is provided, and the testimony does not explain what precipitated Torres having a gun and/or going to the emergency room.

According to Borrego's attorney, Torres did not seek psychological counseling until almost one year and eight months after the alleged hotel incident.  Borrego supplied evidence from psychologist Jerry Blankenbecler that Torres showed up for 5 of 15 scheduled appointments which occurred over a two-month period in 2004.  With respect to the question of what caused Torres' drinking, problems with his girlfriends, and a possible bipolar disorder diagnosis, Blankenbecler was unable to assess causation for these problems.[10]

While the evidence of severe emotional distress is far from compelling or conclusive,[11] the Court determines that Torres has satisfied the threshold of raising a genuine issue of material fact for a jury to decide whether he suffered severe emotional distress due to the alleged actions by Borrego.  However, the Court advises Plaintiff that if his evidence of "severe emotional distress" is nothing more than "garden-variety" damages and/or having been taken to the UNM mental health center for a few hours to be prescribed anti-depressant medication, the claim will be subject to Rule 50(a) judgment as a matter of law.

---

[10]Even worse for Torres is his attorney's argument that Torres' visit to Blankenbecler indicated he suffered "garden variety emotional damages."  [Doc. No. 74, p. 6.]  Garden-variety emotional damages are a far cry from the severe emotional damages required to sustain an IIED claim.  However, Torres' attorney's argument does not amount to admissible evidence on this issue.

[11]Potentially damaging to Torres' assertion of severe emotional distress is the letter he wrote to Regis by approximately four to five months after the hotel incident.  While the letter addresses another matter, Torres states that "Jack Borrego, my regional has helped me out getting back in the business.  He is a very professional and awesome business man . . . . and I didn't want to be a burden to him for he has been so good to me.  I have a lot of respect for him, for he reminds me of my father who is a hard hitting business man . . . .  I love the company and I love help building their business and success. . . ."  [Defendants' Ex. 0.]

Therefore, Defendant's motion for summary judgment as to the IIED claim asserted against him is denied, and it will proceed to trial.

**B.**     **Title VII Claims Asserted Against Borrego**

Borrego makes a number of substantive arguments in his briefing as to why the Title VII claims should be dismissed.  However, those arguments are more properly raised by Regis, as the employer, and indeed, Regis filed a separate motion for summary judgment on the Title VII claims which the Court resolves in a separate Memorandum Opinion and Order.

With respect to the Title VII claims of sexual harassment, hostile work environment, sex discrimination and retaliation asserted against Borrego in his individual capacity, they all must be dismissed under well-settled Tenth Circuit law.  In Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996), the Tenth Circuit addressed the question of whether an individual supervisor or manager could be held personally liable under Title VII.  The Court held that under Title VII, lawsuits against individuals must proceed in their official capacity, which means that any relief granted under Title VII is against the employer and not the individual employees whose actions might constitute a violation of Title VII.  Id. at 899.

> We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly. Therefore, because the suit against [plaintiff's supervisor] could proceed only in his official capacity, it operated as a suit against [plaintiff's employer] itself . . .

Id.  The Tenth Circuit reasoned that the language and structure of amended Title VII reflected the legislative judgment that statutory liability was appropriately borne by employers and not the individual supervisors.  Id. at 901.

24

To the extent that Torres intended to assert the Title VII claims against Borrego in his official capacity, such claims operate against Regis, and will be discussed more extensively in the Court's opinion resolving Regis' motion for summary judgment on the Title VII claims. The Court grants Borrego's motion for summary judgment as to the Title VII claims asserted against him in his individual capacity, and they are dismissed, with prejudice.

## Conclusion

For the above-stated reasons, Defendants' (Regis, Aguilar, and Moeller) Partial Motion for Summary Judgment is granted in part and denied in part, as described herein. Defendant Jack Borrego's Motion for Summary Judgment as to all claims asserted against him is granted in part and denied in part. The result of the Court's decisions in this opinion is that Torres' claim of IIED will proceed against both Regis and Borrego. The claims of defamation and breach of employment contract are dismissed, with prejudice as to all Defendants. The claim of IIED asserted against Aguilar and Mueller is dismissed, with prejudice. The Title VII claims asserted against Borrego are dismissed, with prejudice.

IT IS THEREFORE ORDERED that:

(1)  Defendants' motion to strike [Doc. No. 97] the second affidavit of Joey Torres is DENIED;

(2)  Defendants' (Regis and Moeller) Motion for Protective Order [Doc. No. 60] is DENIED as moot;

(3)  Plaintiff's unopposed motion for an order to file documents under seal [Doc. No. 82] is DENIED as moot;

25

(4)  Defendants' (Regis, Moeller and Aguilar) Motion for Partial Summary Judgment on Plaintiff's Claims of Defamation, Breach of Contract, and Intentional Infliction of Emotional Distress [Doc. No. 65] is GRANTED in part and DENIED in part; and

(5)  Defendant Jack Borrego's Motion for Summary Judgment [Doc. No. 62] is GRANTED in part and DENIED in part.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge
(sitting by designation)

26