## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOEY TORRES,

        Plaintiff,

v.                                       No. CIV 04-248 LFG/RHS

JACK BORREGO,
REGIS CORPORATION,
PAT MUELLER, and
RAMONA AGUILAR,

        Defendants.

## MEMORANDUM OPINION AND ORDER

### Introduction

THIS MATTER is before the Court on Defendants' (Regis Corporation, Pat Moeller[1] and Ramona Aguilar) Motion for Partial Summary Judgment[2] on Title VII Claims and Related State Claims[3] [Doc. No. 67], filed February 15, 2005.  Defendants request summary judgment on Torres' Title VII claims of *quid pro quo* sexual harassment, hostile work environment, sex discrimination and retaliation.  The motion for partial summary judgment is fully briefed and there is no need for oral

---

[1] Defendant's name appears to be spelled "Moeller" rather than "Mueller" as set forth in the caption.

[2] The Court is filing a separate Memorandum Opinion and Order contemporaneously with this decision, addressing two other defense motions for summary judgment.  [Doc. Nos. 62, 65.]  In that decision, the Court dismissed most of the claims except the intentional infliction of emotional distress claim that is permitted to proceed to a jury as asserted against both Regis and Borrego.

[3] Defendants seek summary judgment on the Title VII claims and related claims brought under the New Mexico Human Rights Act.  In his response to the motion, Plaintiff states that he has not asserted Human Rights Act claims in this federal proceeding.  Moreover, the Complaint [Doc. No. 1] does not assert claims under the Human Rights Act.  Therefore, the Court does not address Defendants' motion to dismiss claims brought under the Human Rights Act.  *See* Doc. No. 101 fn. 3.

1

argument before resolving it.  After careful consideration of the pertinent law, pleadings, attachments, supplemental exhibits,[4] and sealed exhibits, the Court concludes that Defendants' motion will be granted in part and denied in part.  The Court's reasoning is set out below.

## Background

Plaintiff Joey Torres ("Torres" or "Plaintiff") brings this employment discrimination action against Defendants Regis Corporation ("Regis"), Pat Moeller ("Moeller"), Ramona Aguilar ("Aguilar") and Jack Borrego ("Borrego").  Torres, who was a hair stylist for Regis, asserts, *inter alia*, that he was subjected to *quid pro quo* sexual discrimination and a hostile work environment based on his gender and was unlawfully discharged for refusing to have sexual relations with Regis' area manager, Jack Borrego.  Moeller was Borrego's regional manager and Aguilar was Torres' direct supervisor, at the time of Torres' termination.

## Summary Judgment Standard

Summary judgment is not a "disfavored procedural shortcut."  Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to

---

[4]The Court addressed Defendants' motion to strike Torres' second affidavit and denied the motion.  *See* Doc. No. 101.  Therefore, Torres' second affidavit is part of the record that was considered by the Court.

interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied,* 537 U.S. 816 (2002).  Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P. 56(e); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Mitchell v. City of Moore, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

## **Material Facts and Chronology**

The Court summarizes the following facts and chronology based on the pleadings and supporting exhibits.  The Court views all reasonable inferences drawn from the record evidence in the light most favorable to Plaintiff.

Torres was employed by Regis and worked at the Sensations Salon in the Cottonwood Mall in Albuquerque, New Mexico.  It is not clear how long Torres worked for Regis as a stylist, but he

was employed by Regis as early as 1999.[5]   This lawsuit concerns Torres' January 21, 2003 termination, which Defendants claim was justified primarily for Torres' failure to make a bank deposit.

It is uncontested that between 1999 and the January 2003 termination date,  Regis took disciplinary actions against Torres for other work-related issues.  Thus, Defendants also contend that Torres' termination in January 2003 was warranted, in part, by some of Torres' earlier disciplinary problems.  Torres, however, asserts that the earlier disciplinary actions (occurring in 2002) amounted to nothing more than "picking on him" and harassment after he refused to submit to Borrego's sexual advances in late 2001.

The more detailed chronology is as follows.  On September 22, 1999, Torres was terminated for allegedly failing to show up to work and failing to attend a mandatory class.  His supervisor Dee Tsosie wrote up the termination.  Torres asserts that he did not fail to show up for work on that occasion but instead, refused to attend the mandatory class because he was not being paid for his attendance.  His 1999 termination papers did not indicate whether or not he could be rehired, but in any event, Regis re-hired Torres in May 2000.

There are no additional documents memorializing verbal or written warnings for Torres' allegedly improper conduct until January 2002.  In the fall of 2001, Torres alleges that Tsosie asked him to have dinner with her and Borrego and that since both were his supervisors, he agreed.  Torres contends that when he called Tsosie to confirm where they were meeting, Tsosie laughed and said she could not make it and that only Torres and Borrego would be meeting for dinner.

---

[5]It appears that Torres may have worked for Regis salons some years prior to 1999 as well.  Borrego testified that Torres worked for Regis about six years.

On November 3, 2001, Borrego met Torres outside the Lone Star restaurant but Borrego did not want to eat there. He told Torres that he had the company car and would drive them both to the Olive Garden, an Albuquerque restaurant. Torres alleges that during the drive, Borrego asked him if he had ever been to the Pulse, a gay bar. Torres responded that he had not because he knew it was a gay bar. Borrego told Torres that many people went to the Pulse who were not gay, and that Torres should go there with Borrego. Torres declined. The two proceeded to the Olive Garden. During the car ride, Borrego did not touch Torres or make any advances. Torres does not recall Borrego complimenting him that night, but stated that Borrego did pay Torres off hand compliments on other occasions, like "Well, we are looking sharp today."

After dinner, Borrego said that he needed to return to his hotel room to retrieve something and that he and Torres should have a drink together in the hotel bar. Borrego was staying at the Crown Plaza Pyramid. Thus, Borrego drove Torres to his hotel. When they arrived, Borrego stated that the hotel bar was closed and that they should instead go to his room to have a drink. Torres asserts that he felt "trapped, belittled and afraid of losing his job," so he went to Borrego's room. Borrego made them cocktails, and Torres sat down in a chair so that Borrego could not sit near him. Without explanation, Borrego turned on the television and played a pornographic movie. Torres was surprised, and the situation made him uncomfortable. He asked Borrego if Regis paid for movies like this when Borrego traveled for the company. Borrego told him that he had to pay for the movies on his personal credit card. Torres stated that the movie was a heterosexual pornographic film and that Torres was "terrified" in response to Borrego playing the movie.

Torres further alleges that Borrego walked towards Torres' chair and asked Torres if Borrego could "suck [Torres'] dick." Torres tried to deflect the proposition by telling Borrego that he did not

"swing that way."   Borrego asked Torres "if he was sure," but posed the question "in a very threatening manner."   Borrego then told Torres that Borrego had been told that he (Borrego) gave the "best head."   Torres told Borrego that indeed, he was sure that he did not want to have sex with Borrego.   At that, Borrego lay down on the bed and began touching his genitals through his pants while Borrego continued to watch the adult movie.   After "a very long silence," Torres asked Borrego to take him home.   Borrego declined and told Torres to take a cab.   Borrego offered to pay Torres for the cab fare the next day.   Torres asserts in his first affidavit that the reason he went to Borrego's hotel room was because he feared losing his job.   Borrego, on the other hand, denies that he had dinner with Torres alone on any occasion and categorically denies all of Torres' allegations regarding the hotel incident.

After the 2001 hotel incident, Torres contends that Borrego spoke to him differently, in a very cold and rude manner and harassed him.   For example, Torres asserts that shortly after the incident Borrego grabbed Torres and shoved him over to his work station and said Torres needed to clean up his hair brushes and combs or the state board would write up the salon.   On another occasion, Torres contends that Borrego complained about Torres' slight facial hair even though Torres had had facial hair on other occasions.

On January 28, 2002, after the hotel incident, a different supervisor verbally warned Torres about being late to work by 35 minutes.   The warning was documented in writing but neither shown to nor signed by Torres.

On March 3, 2002, Torres signed an acknowledgment form that he had read and understood Regis' Workplace Harassment Policy.   It unclear from the parties' submissions what the policy consisted of, unless it is the policy provided to new employees (that Torres claims he never received).

On March 22, 2002, Torres wrote a letter to Regis complaining about his supervisor, Tsosie. In the letter, he stated that Tsosie had slapped him repeatedly in front of two co-workers because of statements allegedly made by Torres comparing Tsosie to another stylist.  Torres also alleges that Tsosie made a number of ethnic based comments to Torres during this incident that he found offensive.  The incident with Tsosie allegedly occurred about three months before Torres actually wrote his letter of complaint.  The letter was prompted after Torres read the workplace harassment policy in March 2002 and realized that he had been the victim of workplace harassment by Tsosie.

In the March 2002 letter, Torres made no mention of the November 2001 hotel encounter with Borrego.  Indeed, Torres was complimentary about Borrego in the letter:

> Jack Borrego, my regional has helped me out getting back in the business.  He is a very professional and awesome business man, but I hated bothering him for I knew my comrades were calling him all the time to complaint about [Tsosie] for months and I didn't want to be a burden to him for he has been so good to me.  I have a lot of respect for him, for he reminds me much of my father who is a hard hitting business man and has owned a 4 star restaurant in Albuquerque at the Sandia Peak Tram for 28 years.
>
> I love the company and love help building their business and success.  I like to settle this matter quickly and privately, without lawyers and courts.

Torres wanted Tsosie never to be allowed to return to Regis and to be paid $5,000 or $10,000 for Torres' emotional distress.  Torres did not receive any compensation for the Tsosie incident and never pursued it further.

On May 30, 2002, Torres was given another verbal warning which was again documented in writing.  This time, the warning was given by Aguilar who was his supervisor then.  On a Friday, Torres had requested to have the next day off.  Aguilar told him that he could take the day off if he

took it as a vacation day.  Aguilar changed her schedule to accommodate Torres on Saturday, but then Torres showed up that day to work stating that he did not want to take a vacation day.  Aguilar believed that Torres did not respect her decision and had treated her disrespectfully in front of customers.  Torres did not see the documented verbal warning or sign it.

The following day, May 31, 2002, Aguilar gave Torres another verbal warning which was also documented in writing.  The warning related to Torres' failure to show up at his scheduled start time of 9:00 a.m.  He arrived at 11:00 a.m., two hours late.  Further, Torres left the salon at 2 p.m. before his shift was up, without informing anyone that he was leaving.  He had an appointment at 2:30 p.m. but did not return to work until 2:45 p.m.  The documented verbal warning states that the next time Torres arrives late or leaves early, he will be given a written warning, and on the third time he will have a possible suspension.  Torres did not recall this warning and did not sign the written documentation.

On September 18, 2002, Borrego gave Torres another verbal warning and Borrego signed the corresponding documentation.  Torres was warned for not ringing up tickets.  The notice states that Torres had "lots of "Misc. and $10.00 items. need all tickets to be broken down when entering into computer properly and no more 10.00 items may give only a 20% discount and no more. if this problem continues we will investigate."

Torres acknowledges this verbal warning, but alleges that it was not justified and that Borrego was just harassing him.  Borrego told Torres not to give discounts any more, even though Torres felt he previously had had the discretion to do so.  According to Torres, he was authorized to give 20-40% discounts for certain items and could charge clients $5 or $10 if clients only wanted their bangs trimmed.  Borrego, however, told Torres he could not do this.

Case 1:04-cv-00248-LFG-RHS   Document 102   Filed 04/07/05   Page 9 of 26

In October 2002, Torres signed an acknowledgment form that he had viewed a videotape on Regis' anti-harassment policy. During the 11 months between the hotel incident and Torres' viewing of the videotape, he did not tell anyone what happened with Borrego in the hotel. However, after he saw the videotape in October 2002, Torres told several co-workers and Aguilar of the hotel incident. Torres claims Aguilar was "too afraid" of Borrego to do anything.[6] Torres did not contact anyone about the alleged harassment by Borrego in accordance with the policy described on the videotape because he was "going to try to hold my job and I thought the incident would go away."

Borrego gave Torres another verbal warning on December 10, 2002. This warning also was documented in writing. It states: "appointments on appointment book does not match time sheets. questioned by me he cannot explain where the money has gone 12/6/2 has 3 appointments down on one 27.00 dollar charge, 11/26/27 color done no money but says color wasn't good but he accepted a tip on 11/27/02 has 4 appointments down only collected for 3." Under action to be taken (on Torres' verbal warning form), Borrego stated "Joey will be watched all appointments will be written in pen this goes for all stylists."

Aguilar, Torres' direct supervisor at this time, testified that she had checked the computer and noticed that the color job Torres did the previous day was not accounted for, so she notified Borrego. When Borrego came into town on December 10, he, Torres and Aguilar had a meeting over this and Torres was given the verbal warning for the incident occurring on November 26. The written

---

[6]Aguilar was evasive in initially responding to the question of whether Torres told her about an alleged sexual harassment incident with Borrego. At first Aguilar stated she did not know, but then she said that Torres talked about it "braggingly," that he was not concerned about it, that he thought it was funny, and that Torres said he would party with Borrego or that he had gone to a hotel room to party with Borrego. If Aguilar is to be believed Torres told her about this incident when Torres and Aguilar were co-workers. However, if Torres is believed, then he told Aguilar when she was his direct supervisor. Aguilar also testified hesitantly that Torres told her Borrego was "hitting on him" but that this conversation also occurred when Aguilar was not Torres' supervisor.

documentation of this verbal warning states that it is a "final warning."  Torres did not sign the documentation.

Torres explained that he did not charge the customer for a hair color job because the color did not take and he did not wish to charge someone for an unsuccessful color process.  Torres claims that all of these warnings amounted to nothing more than harassment and were just examples of why Torres was "walking on eggshells" after the 2001 hotel incident with Borrego.

Torres also alleges that Borrego, from time-to-time, would call him on the telephone.  On one occasion, Borrego called Torres from across the street of the salon and stated: "Hello, Mr. Joey. Don't say anything but I'm right here.  Look over at KB Toys.  Don't tell Ramona I'm here.  Me and David are here. . . . Do you want to go out with us tonight?"  Torres responded "no."  Borrego supposedly stated that "if you can get rid of her, call us."  Torres believed that this telephone call occurred about five months after the hotel incident.  Torres further alleged that Borrego would call him at least once every three or four weeks and would tell Torres that Borrego was just letting Torres know he was in town again, if Torres "wanted to do anything."

Torres claimed that there were several times after the hotel room incident that Borrego pressured him to have sex by telling Torres to call him at the hotel or to come to the hotel.  The last time that Borrego approached Torres about sex was in December 2002 when Borrego called Torres and said that he and his boyfriend were in town and that Torres should call them later at the hotel.

On January 14, 2003, Torres was supposed to make the salon's bank deposit.  In accordance with company policy, Torres was to be accompanied by one other Regis employee, who was to observe the cash count, see the money deposited into a tamper-proof bank deposit bag, and accompany Torres to make the deposit drop-off.  Regis employees make bank deposits after the end

10

of their work shift when they have clocked out.  Regis employees are not paid for the time it takes to make the deposits.  According to Aguilar, Torres would often tell his co-worker that Torres would make the deposit alone.

It is uncontested that Torres did not make the January 14, 2003 bank deposit, which contained about $60.00.  Torres does not dispute that he was responsible for making the deposit, nor does he contest that he failed to make it.  He admits that he had the deposit for one week and failed to inform anyone that he had not made the deposit.  It also is uncontested that Torres took the money out of the deposit bag and exchanged the original deposit bag for a replacement bag allegedly because his puppies chewed up the original bag while he had it inside his home.

Torres contends that he intended to make the deposit the next time he was responsible for a deposit drop, and when he was finally questioned about the deposit by supervisor Aguilar, he took Aguilar to his car trunk where he had the new bank deposit bag containing the original currency, coin and checks for the January 14 deposit.  Torres states that he told Aguilar about the puppies chewing the bag and that he doubted she would have discovered he had switched bags unless he had told her. In Aguilar's deposition, she confirmed that Torres told her about his puppies tearing up the original bank deposit bag.

Torres offers a number of different explanations why he failed to make the deposit, including that he was having a stressful time in his life due to deaths of friends and he simply forgot to make the deposit, that he did not want to make the deposit on the night in question and he knew the bank was located in a dangerous area, that employees often forgot to make deposits and were not disciplined for it, that he did not think it was a "big deal," and that his driving license was suspended at the time due to speeding tickets and he chose not to drive to the bank.

11

Torres concedes that it is a violation of Regis' rules and regulations to hold onto a bank deposit and not make the deposit and that it was indeed a "big problem" in failing to make a deposit over a week's period.  Torres does not challenge Defendants' assertion that upon learning about Torres' failure to  make the deposit, Borrego spoke to Moeller and a decision to terminate Torres was made.  Defendants assert that Borrego and Moeller jointly made the termination decision. Aguilar also may have had input regarding the termination decision.

Torres contends that Borrego made the termination decision on his authority alone and that according to Aguilar,  Borrego had been looking for a way to terminate Torres.  In support of this contention, Torres alleges that Aguilar told Torres that Borrego had been looking for a way to terminate Torres.  Borrego testified that he told Aguilar that they should be watching Torres closely after some of the issues with Torres' appointment book entries.  At some point before January 2003, Borrego told Aguilar that if things did not get straightened out, Torres would be terminated eventually.  Torres was never given a written warning during his employment with Regis.

Torres argues that Regis did not apply its policies uniformly.  For example, there is no evidence that the co-worker who was to make the deposit with Torres on the night in question was disciplined in any way.  In addition, Torres provides evidence that other employees failed to make deposits or lost deposits involving more money, and were not terminated.  Thus, he concludes that his admitted failure to make the deposit is a sham justification for his termination.

Defendants contend that Torres was terminated on January 21, 2003 because of the bank deposit issue, along with Torres' "past work history with us."  Within one to two weeks after his termination, Torres obtained new employment as a stylist at J.C. Penny's hair salon and at Hair Brain. Two other salons would have hired him as well.  Torres worked at J.C. Penny's for about five to six

months before having to leave that salon due to Penny's policy prohibiting work at two salons. Torres continued to work at Hair Brain, but now works in a different salon.

### Defendants' Motion for Partial Summary Judgment

I.   TITLE VII CLAIMS ASSERTED AGAINST AGUILAR AND MOELLER

To the extent that Torres intended to assert the Title VII claims against individually named Defendants Aguilar and Moeller, the claims will be dismissed.  In this Circuit, individual defendants cannot be held personally liable under Title VII.  Haynes v. Williams, 88 F.3d 898 (10th Cir. 1996.) *See also* analysis in Court's April 7, 2005 Memorandum Opinion and Order [Doc. No. 101] with respect to Title VII claims asserted against Borrego.

II.   TITLE VII CLAIMS ASSERTED AGAINST REGIS

A.   Sexual Harassment

Title VII prohibits "discriminat[ion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986), the United States Supreme Court held that a plaintiff could establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment.   "[C]ourts have consistently recognized two distinct categories of sexual harassment claims:  *quid pro quo* sexual harassment, and hostile work environment sexual harassment."  Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).  It is not entirely clear from the pleadings whether Torres intended to assert separate claims of *quid pro quo* sexual harassment and hostile work environment sexual

13

harassment[7] since he refers to both in his complaint.   The Court will examine both claims.

1.    <u><em>Hostile Work Environment-Sexual Harassment</em></u>[8]

In <u>Dick v. Phone Directories Company, Inc.</u>, the Tenth Circuit discussed a hostile work environment claim in relation to a motion for summary judgment.

> Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  This statutory provision prohibits subjecting an employee to a hostile work environment.  "To establish a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."

397 F.3d 1256, 1262-63 (10th Cir. 2005) (internal citations omitted).  A hostile work environment is one where "[sexual] conduct has the purpose or  effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

<u>Meritor Sav. Bank</u>, 477 U.S. at 65 (quotation omitted).  Recently, the Tenth Circuit explained that:

> not all harassment creates a hostile work environment; the harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment."   Severity and pervasiveness are evaluated according to the totality of the circumstances, . . . considering such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . But severity and pervasiveness are not enough.  The "plaintiff must produce evidence that she was the object

---

[7]In <u>Burlington Indus. Inc. v. Ellerth</u>, 524 U.S. 742, 743 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), the United States Supreme Court noted that the continued use of the labels of *quid pro quo* and hostile work environment sexual harassment had taken on a significance exceeding utility.

[8]The Court disagrees with Defendants that Torres abandoned the hostile work environment claim, even though it appears from Torres' response brief that he equivocates about it.  In any event, the claim will not survive the motion for summary judgment.

14

of harassment *because of her gender*."  Title VII is not a code of
workplace conduct, nor was it "designed to bring about a
magical transformation in the social mores of American workers.  Title VII
targets discrimination.

Chavez v. State of New Mexico, 397 F.3d 826, 832-33 (10th Cir. 2005) (internal citations omitted)

(emphasis in original).

A hostile work environment occurs when the workplace is "permeated with discriminatory

intimidation, ridicule and insult . . ."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  The

conduct in question is judged by both a subjective and an objective standard.  *See id.  See e.g.,*

Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1097 (10th Cir. 2005) (finding that from an

objective standpoint, a reasonable jury could conclude that some of the assaults by a supervisor

occurring over a four month period were "extreme in nature, physically threatening, and

humiliating").  While the plaintiff must show that the environment was both objectively and

subjectively hostile, he need not demonstrate that he suffered psychological harm or that his work

suffered as a result of the harassment.  Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257,

1261 (10th Cir. 1998), *cert. denied,* 526 U.S. 1039 (1999).

The requirement that actionable conduct be severe or pervasive is "crucial" in that it prevents

ordinary socializing in the workplace, horseplay, simple teasing or flirtation from becoming prohibited

sexual discrimination.  *See* Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)

(internal citation omitted) (discussing same sex sexual harassment).  Title VII does not provide a

remedy for boorish behavior or bad taste.  *See, e.g.,* Sprague v. Thorn Americas, Inc., 129 F.3d 1355,

1366 (10th Cir. 1997) (holding that unpleasant and offensive conduct does not necessarily create a

hostile work environment).  Nor does conduct that merely engenders offensive feelings or that

amounts to normal job stress violate Title VII.  *See* <u>Smith v. Northwest Fin. Acceptance, Inc.</u>, 129 F.3d 1408, 1412 (10th Cir. 1997).

Here, in viewing all inferences in the light most favorable to Torres, he fails to raise a genuine issue of material fact regarding the severity or pervasiveness of the alleged hostile work environment sexual harassment and/or regarding whether most of the alleged harassment was based on sex.  Torres alleges a single incident of alleged sexual harassment at the hotel in November 2001, several verbal warnings given by supervisors other than Borrego that do not appear to have been based on sex, several verbal warnings given by Borrego that do not appear to have been based on sex, some telephone calls by Borrego in which Borrego made sexual advances towards Torres, and some inconsistencies in the application of Regis' policies that again do not appear to have been based on sex.  Borrego did not live in Albuquerque nor work at Torres' salon, and Torres testified that he only occasionally saw Borrego.  In addition, Torres did not report the alleged sexual harassment to the proper authorities even after viewing a company videotape on anti-harassment procedures.  Based on these allegations, a rational jury could not find that any alleged misconduct was pervasive and so permeated the workplace with discriminatory intimidation, ridicule and insult that it created an abusive work environment and affected Torres' terms and conditions of work.  Because Torres failed to bring forward sufficient evidence for a jury decide with respect to a possible claim of hostile work environment sexual harassment, it will be dismissed with prejudice as asserted against Regis.

### 2.    *Quid Pro Quo Sexual Harassment*

"The gravamen of a *quid pro quo* sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct."  <u>Hicks</u>, 833 F.2d at 1414.

A defendant-employer may refute such a claim if there is no proof of a negative employment action taken by the employer, or by establishing that the decision to terminate was made for legitimate business reasons and not because the employee refused to submit to sexual demands.   Smith v. Cashland, Inc., 193 F.3d 1158, 1160 (10th Cir. 1999).

Defendants do not dispute that Torres was terminated or that Borrego provided input into the termination decision.  Instead, they argue that Torres' complaint does not allege that the conditions of Torres' employment were altered by the alleged sexual advances of Borrego, and that Torres did not allege that Borrego expressly or impliedly told Torres that succumbing to Borrego's alleged sexual advances was a condition of continued employment.  Finally, Defendants argue that Torres was terminated for violating Regis' security regulations, not for rebuffing Borrego's advances.

Contrary to Defendants' assertions, Torres does allege in his complaint that Borrego sought sexual favors, propositioned him for sexual activity, and when Torres refused the advances, that Borrego "arranged the firing of Joey Torres" because of Torres' refusal to submit. [Doc. No. 1, at ¶¶ 15-17.]  In addition, Torres asserted in his first affidavit that he was often threatened with termination for minor and common infractions, and that these threats occurred after the hotel incident. Moreover, it would be the unusual case for a supervisor to expressly condition an employee's job on his or her submission to sexual advances. *See* Burlington, 524 U.S. at 753-54 (where plaintiff shows "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands," she establishes an explicit change in her terms or conditions of employment, resulting in a *quid pro quo* case of sexual harassment).

In addition, while Defendants have presented legitimate non-discriminatory business reasons for their termination decision, Torres placed those reasons in dispute by presenting evidence that

17

several other employees, who lost or failed to make deposits, were not terminated.  For example, Torres submitted written warning notices for three different Regis employees, one of whom worked at the same salon as Torres, who lost deposits in larger sums of money than were at issue in this case. None of the three were terminated although all received written warnings.  Borrego signed one of these three warning notices.[9]

Equally significant is that there is no evidence that Regis followed its own mandatory procedures regarding bank deposits which provide that two employees must perform closeout at the end of each day, that both are to take the deposit bag to the bank and place it in the night depository before going home and that the bank-validated deposit ticket is to be attached to the Daily Closeout Report on the following morning.  "These procedures must be followed every day. . . .  The manager is ultimately responsible for making sure these procedures are followed by all employees."  [Ex. 8A, Manager's Guide (rev. 8/02).]  In other words, there was no evidence presented that the other employee who was to make the deposit with Torres on January 14 was disciplined, nor was there any evidence that the manager (Aguilar) was disciplined for not ensuring that mandatory procedures were followed.  Indeed, the missing deposit was not even discovered by Aguilar, even though it remained missing for six days.

Further, Torres supplied evidence that he was treated differently after the alleged hotel incident, i.e., the documentation of verbal warnings show that Torres was disciplined for what appears to have been minor problems, only after the hotel incident (with the exception of the 1999 termination). Torres also presented evidence through his affidavit testimony that Borrego was calling

---

[9]Regis also submitted termination forms for two employees who had apparently stolen bank deposits. Borrego signed one of these two termination forms.

him to make sexual advances as late as December 2002, only a month before Torres was terminated.

The Court concludes that there are genuine issues of material fact to resolve regarding whether Defendants' articulated reasons for Torres' termination were legitimate. For the reasons stated above, the Court reaches a different conclusion as to Torres' *quid pro quo* sexual harassment claim than it did on Torres' hostile work environment claim, and will permit the *quid pro quo* claim to proceed to a jury. Therefore, the motion for summary judgment as to the Title VII claim of *quid pro quo* sexual harassment asserted against Regis is denied.

**B.    Sex Discrimination**

To establish a prima facie case of discrimination based on gender, a plaintiff must show (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) he was treated less favorably than others not in the protected class. *See* Sanchez v. Denver Pub. Schs., 164 F.3d 527, 531 (10th Cir.1998) (disparate treatment). In some cases, the Circuit Court articulates the last prong of the test[10] to require a showing that the job was not eliminated after the employee was discharged. Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999) (wrongful discharge), *cert. denied*, 529 U.S. 1110 (2000).

At the summary judgment stage, a plaintiff may rely on direct or circumstantial evidence of discriminatory intent. Where there is no direct evidence of discrimination, courts apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, the plaintiff must establish a prima facie case of unlawful discrimination. Assuming he succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for

---

[10]The test is flexible. For example, a plaintiff may establish his *prima facie* case with other evidence that allows an inference of discrimination. Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1227-28 (10th Cir. 2000).

the termination.  If the employer succeeds, the burden returns to the plaintiff to show that the proffered reason for the employment action was merely a pretext for unlawful discrimination.

Torres is a Hispanic male and thus, his gender discrimination claim is analyzed under the reverse discrimination framework.  "When a plaintiff who is a member of a favored group [such as males] alleges disparate treatment, the courts have adjusted the prima facie case to reflect this specific context by requiring a showing of 'background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'"  Sanchez v. Phillip Morris Inc., 992 F.2d 244, 248 (10th Cir. 1993); Notari v. Denver Water Department, 971 F.2d 585 (10th Cir. 1992).  The McDonnell Douglas presumption, i.e., the presumption that unless otherwise explained, the discrimination is more likely than not the reason for the challenged decision, is valid for a reverse discrimination claimant only when the requisite background circumstances exist.  In Notari, the Tenth Circuit explained that the elements of a prima facie case must be adjusted in the context of a reverse discrimination claim because "the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group."  Id. at 589.

Here, after carefully examining Torres' complaint and the sex discrimination claim [Doc. No. 1, Count 2], it appears that Torres did not fully plead a cause of action of gender discrimination. Instead, he states under his "second cause of action" that he was discharged "on account of his gender (sex) which is male" and that he was discharged . . . on account of his gender (sex) in that as a male he was required to participate in sexual activities with his regional supervisor and others as a condition of his continued employment."  [Doc. No. 1, ¶¶ 60, 61, 62, 63.]  In other words the gender discrimination claim, as plead, essentially duplicates the *quid pro quo* sexual harassment claim

("First Cause of Action").  Torres does not allege in his complaint that he was qualified to do the job, that his job remained open or that he was treated less favorably than those not in the protected category.[11]

Even if he were not required to plead the necessary elements of the claim, Torres did not submit evidence to raise a genuine issue of material fact as to each required element of his prima facie case.  The evidence he did present shows that a female employee and possibly two male employees[12] were treated more favorably than he when they received warnings for failing to make bank deposits in contrast to Torres who was terminated over a much smaller sum of money that eventually was deposited.  Thus, there is no evidence to support an inference that an employee's gender affects disciplinary action taken by Regis in response to an employee's failure to make a bank deposit or to follow security procedures.[13]

In addition, Torres, as a member of a historically favored group (male), failed to provide the required showing of "background circumstances" that would support the suspicion or inference that Regis is the unusual employer that discriminates against the majority.  For all of these reasons, summary judgment will be granted to Regis on Torres' Title VII gender discrimination claim, which will be dismissed, with prejudice.

---

[11]In his brief, Torres' counsel makes the argument that he belonged to a protected category (male), that he performed his job satisfactorily (based on the state agency's findings) and that Regis continued to hire others as part its daily routine.  Even if counsel's arguments constituted admissible evidence, they fall short of satisfying of demonstrating the prima facie elements of a Title VII gender discrimination claim.

[12]The Court cannot determine with certainty whether two of the three disciplined employees were males because their names are possibly gender-neutral.

[13]Instead, the inference might arise that Regis makes inconsistent decisions for unknown reasons as to these disciplinary issues.

C.   **Retaliation**

Title VII makes it an unlawful employment practice for an employer "to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" Dick, 397 F.3d at 1267 (*citing* 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, Torres must show that (1) he engaged in protected opposition to discrimination; (2) Regis took an adverse employment action against him; and (3) a causal connection between the protected activity and the adverse action existed. Id. (internal citation omitted).

For purposes of a retaliation claim, as a threshold matter, the plaintiff must provide evidence that he engaged in protected opposition to discrimination. To do so, a plaintiff need not file formal charges of discrimination, testify in a legal proceeding, participate in an investigation or formally complain to management about the alleged unlawful conduct (although all of these activities would suffice). Protected opposition may consist of nothing more than making informal protests, voicing complaints to the employer or using an employer's grievance procedures. Central to these examples is the element of "speaking out" against the unlawful employment practice. This reporting or "speaking out" requirement is logical because the anti-retaliation provisions of Title VII are intended to encourage employees to call to their employers' attention the discriminatory practices about which the employer may be unaware. *See* Berg v. La Crosse Cooler Co., 612 F.2d 1041, 1045 (7th Cir. 1980).

Torres' Complaint alleges summarily that he "opposed practices declared unlawful by 42 U.S.C. § 2000e". Regis denies that Torres engaged in a protected activity sufficient to satisfy the first prong of a retaliation claim. However, because Regis believes the determination presents a factual

question, it assumes for purposes of deciding the summary judgment motion that Torres engaged in a protected activity by opposing Borrego's alleged sexual advances.    [Doc. No. 89, p. 21, n. 11.]

The Court disagrees with Regis and concludes that the determination of whether one's refusal to submit to sexual advances or alleged sexual harassment constitutes engaging in protected activity is a legal question.  The Tenth Circuit has not yet decided this question.

In Roberts v. County of Cook, 2004 WL 1088230 (N.D. Ill. May 12, 2004), the district court addressed the same question in response to the defendants' motion for judgment not withstanding the verdict.  The plaintiff presented evidence that she suffered an adverse employment action for rebuffing her supervisor's sexual advances.  Id. at *4.  The trial court noted that the plaintiff's theory depended on whether her refusal of sexual advances constituted protected activity.  The Seventh Circuit had declined to decide the issue, and as of May 2004, no other circuit court had decided the issue.  Like the Seventh Circuit, the Second and Third Circuits had declined to reach a decision regarding this question.  Id.  The Norther District of Illinois Court observed that district judges within and outside its circuit were divided on the matter.  A number of courts decided that refusal of sexual advances did not constitute protected activity while an equal number of district court judges found to the contrary.  Id. (collecting cases).  The Roberts court proceeded to find that the plaintiff's refusal to submit to her supervisor's sexual advances constituted engaging in protected activity.  Id. at *5.

The Court finds more persuasive the reasoning of the Southern District of New York District Court in Del Castillo v. Pathmark Stores, Inc., 941 F. Supp. 437 (S.D.N.Y. 1996).  In Del Castillo, the trial court granted summary judgment in favor of the employer on the retaliation claim, in part because the employee's act of declining alleged sexual advances did not constitute "protected activity."  The Court first observed that while such protected activity may consist of "filing a lawsuit

23

or formal complaint with an agency, . . . it may also take the form of less formal protests, such as making complaints to management, writing critical letters to customers, or expressing support of co-workers who have filed charges." Id. at 438 (internal citations omitted).

> But even the broadest interpretation of a retaliation claim cannot encompass instances where the alleged "protected activity" consists simply of declining a harasser's sexual advances, which is all that is alleged here by way of "protected activity." *If it were otherwise, every harassment claim would automatically state a retaliation claim as well.*

Id. at 438-39 (emphasis added). The trial court further explained:

> Indeed, in this case, the merger of the two claims would be complete, for plaintiff further concedes that no one at [defendant-employer] beyond the alleged harasser knew of plaintiff's alleged "protected activity" of refusing the harasser's sexual advances. Because an employee who sexually harasses a fellow employee would have no incentive to inform the employer of his actions, the knowledge of the harasser cannot fairly be imputed to his employer).

Id. at 439. *See also* Rachel-Smith v. FTData, Inc., 247 F. Supp. 2d 734, 748 (D. Md. 2003) (holding that the plaintiff's e-mail and verbal requests to alleged harasser did not constitute protected activity for purposes of retaliation claim and reasoning that to the extent the plaintiff communicated only that alleged harasser should cease his sexual advances, she failed to communicate that she was requesting this because she believed the advances to be illegal; moreover, her communications were made only to the alleged harasser).

In Jones v. County of Cook, 2002 WL 1611606 (N.D. Ill. July 17, 2002), the trial court similarly found that the allegation that the plaintiff was terminated in retaliation for refusing supervisor's sexual advances, even if proven true, was insufficient to show she engaged in protected activity. Id. at *3. "The denial of a superior's sexual advances . . . is not the type of 'opposition' to

an unlawful employment practice contemplated by [42 U.S.C. § 2000e-3(a)]." Id.  The trial court

provided this reasoning:

> The purpose of the anti-retaliation provision is to prevent employee
> grievances and Title VII claims from being deterred.  [The plaintiff]
> does not allege, though, that [the supervisor] retaliated against her for
> complaining to his superiors or for filing a Title VII claim.  Rather,
> [she] alleges that [her supervisor] terminated her because she refused
> his sexual advances.  While this may give rise to a claim for sexual
> discrimination, it does not state a claim for retaliation.

Id. at *4 (internal citation omitted).  Thus, the court dismissed the retaliation claim.

       Here, Torres primarily asserts, as best can be determined from his pleadings, that his refusal

to submit to Borrego's sexual advances constituted protected activity.  He concedes that even after

signing for the anti-harassment policy and viewing the anti-harassment video, he did not complain of

Borrego's alleged conduct to Regis management.  He did not file any reports or charges about the

hotel incident.  He did not call any of the telephone numbers provided in the anti-harassment

videotape to make a report of the alleged unlawful conduct.  In addition, Torres did not informally

voice any complaints to management about alleged unlawful conduct by Borrego.[14]  Indeed, to the

contrary, he complimented Borrego in a letter written to Regis in March 2002, only three or four

months after the hotel incident.  It almost defies logic that after viewing the written anti-harassment

policy in March 2002, Torres was alerted only to alleged harassment by supervisor Tsosie for

---

[14]Torres does allege that he reported what happened at the hotel to Aguilar when she was his supervisor but not until approximately 11 months after the fact.  Torres provided virtually no details of what he told Aguilar. Torres testified in his deposition that when he watched the anti-harassment videotape in October 2002, he refused to sign to show he had viewed the tape.  Aguilar then told him he needed to sign it. Torres responded that "You can tell Jack I'm not going to sign it, not after I got hit in the face [referring to the Tsosie incident].  They didn't care about that.  And then, Mona [Aguilar], Jack asked me if he could suck my dick in the hotel."  The timing and content of Torres' informal "report" simply do not convince the Court that Torres raised a genuine issue of material fact to show he engaged in protected activity.  Moreover, Torres' self-serving affidavit, prepared in March 2005, for purposes of this litigation does not convince the Court otherwise.

slapping him in front of co-workers (three months prior to this date), and yet not prompted to report alleged unlawful and unwelcome sexual harassment by Borrego (also occurring three to four months before this date).[15]

For these reasons, the Court will grant Defendants' motion for summary judgment as to the retaliation claim against Regis, and it will be dismissed, with prejudice.

<u>**Conclusion**</u>

The Court concludes that Defendants' motion for summary judgment as to the Title VII claims will be granted and denied in part, with the result that the Title VII claim of *quid pro quo* sexual harassment against Defendant Regis will proceed to trial. The Title VII claims asserted against Aguilar and Moeller are dismissed, with prejudice, and the Title VII claims asserted against Regis for hostile work environment sexual harassment, gender discrimination and retaliation are dismissed, with prejudice. The Court does not decide any claims brought by Torres against Defendants arising under the New Mexico Human Rights Act. As set forth in the Court's Memorandum Opinion and Order resolving Defendants' other partial motions for summary judgment, the intentional infliction of emotional distress claim against Regis and Borrego will also proceed to trial.

IT IS THEREFORE ORDERED that Defendants' (Regis Corporation, Pat Moeller and Ramona Aguilar) Motion for Partial Summary Judgment on Title VII Claims and Related State Claims is GRANTED in part and DENIED in part, as described herein.

Lorenzo F. Garcia
Chief United States Magistrate Judge
(sitting by designation)

---

[15]Torres' attempt in his March 2005 affidavit to explain away the inconsistencies in his March 2002 letter is self-serving and unconvincing.